UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
RALPH J. SCOPO,

                              Plaintiff,

             -against-

LABORERS' INTERNATIONAL UNION OF
NORTH AMERICA, LABORERS'
LOCAL 6A CONCRETE WORKERS, and BRUCE
MOUW, in his official and individual capacity,

                            Defendants.
------------------------------------------------------------X

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
11-cv-3991 (CBA)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 06 2013 ★
BROOKLYN OFFICE

**AMON, Chief United States District Judge.**

## INTRODUCTION

Plaintiff Ralph J. Scopo commenced the above-captioned action on August 18, 2011 against Laborer's International Union of North America ("LIUNA"), Laborers' Local 6A Concrete Workers ("Local 6A"), and Bruce Mouw in his official and individual capacities.[1] The action arises out of Scopo's removal from various union posts subsequent to LIUNA's implementation of a trusteeship over Local 6A. Scopo initially asserted violations of 42 U.S.C. § 1983, § 301 of the Labor Management Relations Act ("LMRA"), and various state torts. He filed an amended complaint on December 21, 2011, which did not include the § 301 claims. All defendants now move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated below, the motions are granted.

---

[1] On February 8, 2013, the Court approved a stipulation and discontinuance with prejudice against defendants Cement and Concrete Workers Council and Alex Castaldi. Additionally, at oral argument, Scopo's counsel conceded that Scopo has no remaining claims against Local 6A. (Tr. of Oral Arg. at 32.) Local 6A's motion to dismiss is therefore granted.

1

## BACKGROUND

*I. Scopo's History at Local 6A*

Ralph Scopo, a resident of Suffolk County, is the son of Ralph Scopo, Jr. and the grandson of Ralph Scopo, Sr. Am. Compl. ¶¶ 4, 18-19. His father and grandfather are reputed members of an organized crime family. Am. Compl. ¶ 19. Scopo claims that although he has "maintain[ed] a father/son familial relationship with his father, he has never engaged in, or conducted illegal activities or business with his father or his father's purported associates." Am. Compl. ¶ 20.

Scopo became a member of Local 6A in the fall of 1988. Am. Compl. ¶ 23. He worked as a general construction laborer for fourteen years. Am. Compl. ¶ 24. Between 2001 and 2008, Scopo attained several leadership positions within the union hierarchy. Am. Compl. ¶¶ 35, 38, 42, 46, 47, 49. As far as can be gleaned from the amended complaint, Scopo held each of these positions until early-2011, at which time LIUNA assumed trusteeship over Local 6A and removed Scopo from his positions. Am. Compl. ¶¶ 22, 107, 111; *see* Slevin Decl. ex. 14, 15.

*II. DOJ and LIUNA's Efforts to Eradicate Corruption*

The amended complaint alleges that LIUNA is both party to an agreement with and subject to a consent decree in favor of the United States of America. Both are allegedly for the purpose of eliminating from LIUNA and its subordinate entities the "corrupting influence of any member of organized crime." Am. Compl. ¶ 59, 62. The amended complaint does not fully illuminate the background of this alleged agreement, but it is generally a matter of public record. In 1994, the Department of Justice ("DOJ") concluded that LIUNA had been infiltrated by members of organized crime. *Serpico v. LIUNA*, 97 F.3d 995, 996 (7th Cir. 1996). DOJ drafted a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, and it warned LIUNA that it would file the complaint unless LIUNA took corrective action. *Id.* at 996-97.

In response, LIUNA "amended [its] constitution to include an 'Ethics and Disciplinary Procedure.'" This amendment "created an administrative mechanism for the investigation and prosecution of allegations of" knowing association with a member of organized crime. *Panczykowski v. LIUNA*, 2 F. App'x 157, 159 (2d Cir. 2001). LIUNA appointed four independent officers to administer this procedure. LIUNA Mem. in Supp. at 3. Apparently satisfied, DOJ entered into an agreement with LIUNA in 1995 in which it promised not to file its complaint for 90 days, but reserved the right to file a consent decree after that time authorizing court officers to oversee LIUNA. *Id.* at 3-4. LIUNA has provided documentation that the agreement was extended three times. Slevin Decl. ex. 8-10. It also claims, contrary to the allegations in the amended complaint, that there is currently no agreement in effect and that no consent decree was ever entered, but that it has elected voluntarily to continue its efforts to eradicate the corruptive influence of organized crime. LIUNA Mem. in Supp. at 4, 14.

*III. The Trusteeship Allegations and Scopo's Removal*

On December 21, 2010, Special Counsel filed a trusteeship complaint against Local 6A. Slevin Decl. ex. 11; Am. Compl. ¶ 27. Scopo has not provided that complaint, but LIUNA has, and the Court takes judicial notice of the fact of the allegations contained therein. The trusteeship complaint alleged, in relevant part, that Dino Calabro, a Colombo family captain, controlled Local 6A through Colombo family soldier (and plaintiff's father) Ralph Scopo, Jr. Slevin Decl. ex. 11 ¶¶ 23-24. It further alleged that Scopo had accompanied Scopo, Jr. to a meeting with Calabro regarding Local 6A, and that in 2008 Scopo was installed as Business Manager of Local 6A because Scopo, Jr. was suspicious of Frank Agnello, Scopo's predecessor. *Id.* ¶¶ 27, 30-34. The complaint accused the Colombo family—through Scopo and other crime family associates

who had been installed in positions throughout Local 6A's ranks—of running schemes involving vacation pay and the diversion of funds earned from worksite food stands. *Id.* ¶¶ 39-54.

Scopo denies any wrongdoing. The central allegation in his amended complaint is that "LIUNA sought to remove [him] from the Board and the other aforementioned positions held with LIUNA, Local 6A and the [Cement & Concrete Workers District Council ("District Council")] solely because he is the son of Ralph Scopo, Jr., an alleged Colombo crime family member." Am. Compl. ¶ 75.

According to Scopo, defendants took several steps towards this end. One of these, of course, was the initiation of allegedly baseless trusteeship proceedings. At some point—Scopo has not provided the date, but it appears to have been February 7, 2011, Slevin Decl. ¶ 12—LIUNA sent a letter to members of Local 6A giving notice of the impending trusteeship hearing and describing the trusteeship complaint, including the allegations against Scopo. Am Compl. ¶ 86. Scopo claims that these allegations were false, and that they were designed to turn Local 6A members against him. Am. Compl. ¶ 89-91. Scopo also alleges that he was harassed by Bruce Mouw, the Lead Investigator for LIUNA. He alleges that Mouw "sent FBI agents to his home with a fake subpoena in order to scare him into talking," Am. Compl. ¶ 92, and that Mouw called him several times before the trusteeship hearing in an attempt to harass him, Am. Compl. ¶ 115.

In early-March 2011, the Laborers' Independent Hearing Officer ("IHO") held a trusteeship hearing. Am. Compl. ¶ 100; Slevin Decl. ex. 14, at 2. Mouw and FBI Agent Scott Curtis testified at the hearing, apparently relating evidence obtained from witnesses who were cooperating with two federal prosecutions of Colombo family members. *Id.* at 5-7. Soon after the hearing, the IHO held that a trusteeship was necessary to eliminate the influence of organized crime from Local

4

6A. *Id.* at 32. As a result of the trusteeship, Scopo was removed from all positions within the union. Am. Compl. ¶ 105.

## DISCUSSION

*I. Standard of Review Under Fed. R. Civ. P. 12(b)(6)*

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move for dismissal on the ground that the complaint "fail[ed] to state a claim upon which relief can be granted." In reviewing a 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Kittay v. Kornstein*, 230 F.3d 531, 537 (2d Cir. 2000). Although a reviewing court is generally restricted to the allegations in the complaint, "[i]n certain circumstances, the court may permissibly consider documents other than the complaint in ruling on the motion under Rule 12(b)(6)." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Among these additional materials are "documents that the plaintiff either possessed or knew about and upon which [he] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000), "matters of public record," *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998), and "documents filed in other courts," *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). When a court takes judicial notice of materials such as the above, "it does so in order to determine *what* statements [they] contained . . . but . . . not for the truth of the matters asserted." *Roth*, 489 F.3d at 509 (quotation marks omitted).

In order to survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint need not include "detailed factual

5

allegations," but mere "labels and conclusions" will not suffice. *Twombly*, 550 U.S. at 555. The "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 679.

*II. Claims Under 42 U.S.C. § 1983*

Scopo's first two claims are for violation of 42 U.S.C. § 1983. His first § 1983 claim is that defendants violated his right to intimate association under the First Amendment when they removed him from his union posts solely on the basis that he is the son of an alleged member of organized crime. His second § 1983 claim is that he was denied his right to due process under the Fifth Amendment when he was denied the opportunity to confront the cooperating witnesses whose statements were introduced at the trusteeship hearing.

Defendants argue that Scopo cannot establish that defendants were state actors, as required to make out a claim under § 1983. *United States v. International Broth. of Teamsters, et al* ("*Senese & Talerico*"), 941 F.2d 1292, 1295-96 (2d Cir. 1991). As authority, they rely on *Senese & Telerico*, a Second Circuit case with facts nearly identical to those alleged in the amended complaint, which held that a union's imposition of sanctions pursuant to its own constitution, and carried out by individuals not under government control, does not constitute state action. *Id.* at 1296-97. The Court agrees that *Senese & Talerico* controls this case, and Scopo's counsel conceded at oral argument that he could not distinguish it. For the reasons stated upon the record at oral argument, defendants' motion is granted as to the § 1983 claims. Tr. of Oral Arg. at 4-6.

*III. State Law Tort Claims*

Scopo also advances claims under New York state tort law. He alleges (1) tortious interference with prospective economic advantage against LIUNA; (2) libel and slander per se

6

against LIUNA; (3) abuse of process against LIUNA and Mouw; and (4) intentional infliction of emotional distress against LUINA and Mouw.[2]

*A. Claims Against LIUNA and Mouw in His Official Capacity*

Defendants argue that all claims against LIUNA and Mouw in his official capacity (collectively "union defendants") are preempted by § 301 of the Labor Management Relations Act, foreclosed by New York state's so-called *Martin* rule, or both.

Section 301 of the LMRA governs "[s]uits for violation of contracts between an employer and a labor organization representing employees . . . , or between any such labor organizations." 29 U.S.C. § 185(a). It is well-settled that "where the resolution of a state-law claim depends on an interpretation of [a] collective-bargaining agreement, the claim is pre-empted" by this provision. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 261 (1994). This includes "claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987).

Several, if not all, of Scopo's state tort claims would require the Court to analyze LIUNA's constitution, which qualifies as a contract between labor organizations under § 301. *Wooddell v. Int'l Brotherhood of Elec. Workers*, 502 U.S. 93, 99 (1991) (explaining that a union constitution is the "most commonplace form of contract between labor organizations."). For example, the Court could not determine whether the union defendants' removal of Scopo from his union positions constituted tortious behavior without analyzing the LIUNA constitution's "Ethics and Disciplinary Procedure" to determine the purposes or propriety of the union defendants' actions. Indeed, at oral argument, counsel for Scopo conceded that "it may be" that the Court would need

---

[2] Again, although Scopo initially brought the intentional infliction of emotional distress claim against Local 6A, counsel conceded at oral argument that Scopo is no longer asserting this or any other claim against Local 6A. (Tr. of Oral Arg. at 32).

to interpret the LIUNA constitution to determine whether Scopo's ouster was appropriate. Tr. of Oral Arg. at 14-15.

Even if some of Scopo's state tort claims would not require interpretation of the LIUNA constitution—and therefore are not preempted—those remaining claims are foreclosed by New York's well-settled *Martin* rule. In *Martin v. Curran*, 303 N.Y. 276, 280 (1951), the New York Court of Appeals explained that

> [a] voluntary, unincorporated membership association is neither a partnership nor a corporation. It is not an artificial person, and has no existence independent of its members. No agency of one member for another is implied. A part of the members of a voluntary organization cannot bind the others without their consent before the act which it is claimed binds them is done, or they, with full knowledge of the facts, ratify and adopt it. (quotation marks and citations omitted).

In other words, "suits against association officers, whether for breaches of agreements or for tortious wrongs, [are limited] to cases where the individual liability of every single member can be alleged and proven." *Id.* at 282. And although courts have questioned the wisdom of the *Martin* rule, it remains the law in New York. *See, e.g.*, *Morrissey v. National Maritime Union of America*, 544 F.2d 19, 33 (2d Cir. 1976) (discussing *Martin* rule and acknowledging "we must follow the law of New York as declared by its highest court, whatever our own views might be"); *R.M. Perlman, Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union*, 789 F. Supp. 127, 131-32 (S.D.N.Y. 1992) (discussing and collecting cases); *see also Goodman v. Port Authority*, No. 10-cv-8352, 2011 WL 3423800, *10 (S.D.N.Y. Aug. 4, 2011).

Scopo has not alleged the liability of every member of the union, and counsel conceded at oral argument that he could not do so. Tr. of Oral Arg. at 33. Moreover, at oral argument counsel was not able to offer any possible exception to the *Martin* rule that might permit Scopo's

claims to survive.³ *Id.* Accordingly, any claims that are not preempted by § 301 are nevertheless dismissed on the basis of the *Martin* rule.

For the reasons stated above and on the record at oral argument, either the doctrine of preemption and/or the *Martin* rule disposes of all state law claims against the union defendants. The Court therefore grants the motion to dismiss with respect to those claims and defendants.

*B. Claims Against Mouw in His Individual Capacity*

Scopo's only remaining claims are those asserted against Mouw in his individual capacity. Mouw argues that Scopo has failed to state a claim upon which relief may be granted. The Court agrees.

1. *Abuse of Process*

Scopo's first claim against Mouw is for abuse of process. This claim is based upon the unadorned allegation that on some unspecified date, "Mouw [], a retired special agent of the Federal Bureau of Investigation (FBI), sent FBI agents to Plaintiff's home with a fake subpoena in order to scare him into talking about the purported organized criminal activity within LIUNA." Am. Compl. ¶ 92. At oral argument, counsel reiterated Scopo's understanding that the subpoena was not real. Tr. of Oral Arg. at 20. To begin with, the Court is highly skeptical that the use of a fake subpoena could constitute abuse of process when no actual process has ever issued. Generally in the context of an abuse of process claim, "legal process means that a court issued the process, and the plaintiff will be penalized if he violates it." *Cook v. Sheldon*, 41 F.3d

---

³ Perhaps the most well-established exception to the *Martin* rule was recognized by the New York Court of Appeals in *Madden v. Atkins*, 4 N.Y.2d 283 (1958). *Madden* essentially held that the *Martin* rule is not applicable to a suit claiming damages for wrongful expulsion pursuant to a union constitution. *Id.* at 296; *Morrissey v. Nat'l Maritime Union of Am.*, 544 F.2d 19, 33 (2d Cir. 1976). Even if *Madden*'s exception would save from the *Martin* rule any of Scopo's claims that are based on his removal from union positions—and the Court notes again that Scopo has not made this argument—those sorts of claims would by definition challenge action taken "in accordance with the union constitution," *Madden*, 4 N.Y.2d at 296. As such, they would require the Court to analyze LIUNA's constitution, and are therefore plainly preempted by § 301.

73, 80 (2d Cir. 1994) (quoting *Mormon v. Baran*, 35 N.Y.S.2d 906, 909 (Sup. Ct. 1942)); *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Assoc., Inc.*, 38 N.Y.2d 397, 405 (1975) (to succeed on an abuse of process claim, "there must be regularly issued process . . . compelling the performance or forebearance [sic] of some prescribed act"); *Williams v. Williams*, 23 N.Y.2d 592, 596 (1969) ("The gist of an action for abuse of process lies in the improper use of process after it is issued." (quotation marks omitted)). The use of a phony subpoena seeks to compel action not through the improper manipulation of judicial authority, but through misrepresentation and trickery. Since no actual process is alleged to have been issued, Scopo cannot establish "unlawful interference with [his] person or property under color of process," *Williams*, 23 N.Y.2d at 596.

In any event, as counsel for Scopo conceded at oral argument, Scopo declined to speak with the FBI agents who allegedly appeared with the fake subpoena. Tr. of Oral Arg. at 20. That is, he was not in fact compelled to do anything. It is well-settled that a plaintiff "must allege and prove actual or special damages in order to recover" for abuse of process. *See Bd. of Educ. of Farmingdale Union Free Sch. Dist.*, 38 N.Y.2d at 405; *Jaquez v. DiMarzio, Inc.* 216 F. Supp. 2d 139, 142 (E.D.N.Y. 2002); *Beezhold v. Allegiance Healthcare Corp.*, No. 99-cv-299, 2000 WL 1092886, *4 (S.D.N.Y. Aug. 4, 2000). Special damages involve interference with person or property "beyond the ordinary burden of defending a lawsuit." *Jacques*, 216 F. Supp. 2d at 142 (citing *Engel v. CBS, Inc.*, 145 F.3d 499, 503 (2d Cir. 1998)). Because Scopo has not alleged any interference with person or property resulting from the phony subpoena incident—at least not beyond the formulaic recitation of "irreparable injury and monetary damages"—his claim fails.

## 2. *Intentional Infliction of Emotional Distress*

Scopo's second claim against Mouw is for intentional infliction of emotional distress in connection with the alleged fake subpoena incident. To state a claim for intentional infliction of emotional distress, a plaintiff must show "extreme and outrageous conduct." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Id.* (quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 122 (1993)). The Court finds that the alleged fake subpoena incident does not come close to satisfying the above criteria. At most it involved sharp dealing; it was certainly not "beyond all possible bounds of decency." Accordingly, the intentional infliction of emotional distress claim against Mouw is dismissed.

## *IV. Motion to Amend*

Scopo has also requested leave to amend his amended complaint. Under Fed. R. Civ. P. 15(a), leave to amend should be denied "only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 603-04 (2d Cir. 2005) (internal quotation marks omitted). At oral argument, counsel for Scopo enumerated the allegations he would add to the amended complaint if granted leave to do so. None of the proposed allegations would cure the defects discussed above. Accordingly, the Court denies the motion for leave to amend on the ground of futility.

## CONCLUSION

For the reasons stated above, the motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) are GRANTED. Scopo's motion for leave to amend is DENIED. The Clerk of Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: March 6, 2013
      Brooklyn, N.Y.

s/Carol Bagley Amon

Carol Bagley Amon
Chief United States District Judge